**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**SARAH WALKER,**

    **Plaintiff,**

**v.**           No.  09-CV-0060  JB/RLP

**THI OF NEW MEXICO AT HOBBS CENTER**
**d/b/a HOBBS HEALTH CARE CENTER,**
**DIANA MELTON, JAIME ANDUJO, DEBBIE**
**LOTHRIDGE, KAREN HOOD (MILLER), THI OF NEW**
**MEXICO, FUNDAMENTAL CLINICAL CONSULTING, LLC,**
**FUNDAMENTAL ADMINISTRATIVE SERVICES, LLC,**
**THI OF BALTIMORE, INC.**, **AND FUNDAMENTAL LONG TERM**
**CARE HOLDINGS, LLC.**

    Defendants.

**SECOND AMENDED COMPLAINT**

   COMES NOW the Plaintiff, by and through her attorneys, and for her causes of

action states as follows:

   1.  Plaintiff brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42

U.S.C. §§ 2000(e), et seq.; 42 U.S.C. §1981; the New Mexico Human Rights Act, N.M.

Stat. Ann. § 28-1-7(F), (G) and (I); and the common law.   Plaintiff contends that

Defendants unlawfully discriminated against her and terminated her employment with the

Hobbs Health Care Center, a nursing home in Hobbs, New Mexico, because of her race

(African American) in violation of her rights under federal and state law.   Plaintiff received

a determination by the Equal Employment Opportunity Commission that there was

probable cause to believe she had been the victim of race discrimination and received a

Notice of Right to Sue from the EEOC after October 28, 2008, and her Title VII claims in

this lawsuit were timely filed.

2.  Jurisdiction over the federal claims is proper under 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. §2000e-5(f)(3).  Supplemental jurisdiction over the state claims is proper under 28 U.S.C. § 1367 because the state claims are so related to the federal claims that they are part of the same case or controversy and derive from the same common nucleus of operative facts.  Venue is proper in New Mexico pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this district and pursuant to 42 U.S.C. §2000e-5(f)(3) because the unlawful employment practices alleged in this Second Amended Complaint (hereinafter, "SAC") were committed in this Judicial District.

3.  Plaintiff Sarah Walker is a 45 year old African American woman who resides in Hobbs, New Mexico.  Plaintiff was employed as the Business Office Manager at the Hobbs Health Care Center in Hobbs, New Mexico from August 2005 until January 8, 2007.

4.  Defendant THI of New Mexico at Hobbs Center, LLC (hereinafter, "THI-Hobbs") is a Delaware corporation doing business in New Mexico as the Hobbs Health Care Center, a long-term care nursing home located at 5715 Lovington Highway, Hobbs, New Mexico. At all times material hereto, Defendant employed more than 15 employees.  Defendant THI-Hobbs is wholly owned by a holding company, Defendant THI of New Mexico, LLC.

5.  There are at least 11 corporations with the name "Defendant THI of New Mexico at [a location]" listed by the New Mexico Public Regulatory Commission.  These corporations, including Defendant THI-Hobbs, run nursing homes located throughout New Mexico.  The NM PRC also lists three more THI corporations: "THI of New Mexico," "THI of New Mexico Hospice" and "THI of New Mexico Therapy."  All of these corporations are Delaware corporations doing business in New Mexico.  There are currently over 100 "THI"

nursing homes and health care facilities in at least 15 states across the United States.

6.  Defendant Diana Melton was at all times material hereto a Regional Account Manager employed by Defendant Fundamental Administrative Services, LLC with responsibility over the business operations of Defendant THI of New Mexico at Hobbs Center and over Plaintiff and her immediate supervisor in Hobbs, Billy Cummings. Defendant, acting in concert with the other defendants, is responsible for the illegal termination of Plaintiff's employment.  Defendant's actions that are the subject of this SAC were taken within the course and scope of her employment by Defendant Fundamental Administrative Services.

7.  Defendant Jaime Andujo was at all times material hereto the Regional Director of Operations for New Mexico employed by Defendant Fundamental Clinical Consulting, LLC with responsibility over the operations of Defendant THI of New Mexico at Hobbs Center and over Plaintiff and her immediate supervisor in Hobbs, Billy Cummings. Defendant, acting in concert with the other defendants, is responsible for the illegal termination of Plaintiff's employment and other racially discriminatory conduct toward Plaintiff.  Defendant's actions that are the subject of this SAC were taken within the course and scope of his employment by Defendant Fundamental Clinical Consulting.

8.  Defendant Debbie Lothridge was at all times material hereto a Regional Account Manager employed by Defendant Fundamental Administrative Services, LLC with responsibility over the business operations of Defendant THI of New Mexico at Hobbs Center and over Plaintiff.  Defendant, acting in concert with the other  defendants, is responsible for the illegal termination of Plaintiff's employment and other racially discriminatory conduct toward Plaintiff.  Defendant's actions that are the subject of this SAC were taken within the course and scope of her employment by Defendant

Fundamental Administrative Services.

9.   Defendant Karen Hood (Miller) was at times material hereto the Vice President of Human Resources employed by Defendant Fundamental Administrative Services, LLC with responsibility over the personnel operations of Defendant THI of New Mexico at Hobbs Center and over Plaintiff and her immediate supervisor in Hobbs, Billy Cummings. Defendant, acting in concert with the other defendants, is responsible for the illegal termination of Plaintiff's employment.  Defendant Hood's actions that are the subject of this SAC were taken within the course and scope of her employment by Defendant Fundamental Administrative Services.

10.   Defendant THI of New Mexico (hereinafter, "THI-NM") is the holding company for all 11 THI Health Care Centers or nursing homes located in New Mexico, including Defendant Hobbs Health Care Center.  On information and belief it is a non-New Mexico corporation doing business in New Mexico. Defendant, acting in concert with the other defendants, is responsible for the illegal termination of Plaintiff's employment and other racially discriminatory conduct toward Plaintiff.  Defendant THI-NM is wholly owned by another holding company, Defendant THI of Baltimore, Inc.,  which is the sole member of THI-NM.

11.   Defendant Fundamental Clinical Consulting, LLC (hereinafter "FCC") provides management services to THI-NM's nursing homes and health care centers in New Mexico. On information and belief it is a non-New Mexico corporation doing business in New Mexico.   At all times material hereto, FCC was the employer of Defendant Jaime Andujo. FCC had responsibility over the operations of Defendant THI of New Mexico at Hobbs Center and over Plaintiff and her immediate supervisor in Hobbs, Billy Cummings. Defendant, acting in concert with the other defendants, is responsible for the illegal

termination of Plaintiff's employment and other racially discriminatory conduct toward Plaintiff. Under materially identical contracts with all THI-NM facilities, FCC has the authority, *inter alia,* to monitor facility compliance with clinical policies and procedures, coordinate and maintain facility operations data, and maintain a comprehensive survey result data base. Defendant FCC is wholly owned by another holding company, Defendant THI of Baltimore, Inc., which is the sole member of FCC.

12. Defendant Fundamental Administrative Services, LLC (hereinafter "FAS") provides administrative services to THI's nursing homes and health care centers in New Mexico. On information and belief it is a non-New Mexico corporation doing business in New Mexico. At all times material hereto, FAS was the employer of Defendants Diana Melton, Debbie Lothridge and Karen Hood (Miller). FAS had responsibility over the administration and business operations of Defendant THI of New Mexico at Hobbs Center and over Plaintiff and her immediate supervisor in Hobbs, Billy Cummings. Defendant, acting in concert with the other defendants, is responsible for the illegal termination of Plaintiff's employment and other racially discriminatory conduct toward Plaintiff. Under materially identical contracts with THI-NM facilities, FAS is responsible for providing, *inter alia,* payroll and personnel services to each facility, including administration of payroll, employee benefit programs, management of human resources, employee training, book keeping, accounting, budgeting, forecasting, financial analysis, billing, collections services, and accounts payable services. Defendant FAS is wholly owned by another holding company, Defendant Fundamental Long Term Care Holdings, LLC, which is the sole member of FAS.

13. Defendant THI of Baltimore, Inc. (hereinafter "THI-Baltimore") is a holding company for Defendants THI-NM and FCC. THI-Baltimore is the sole member of both THI-

NM and FCC.   On information and belief it is a non-New Mexico corporation doing business in New Mexico.

14.   Defendant Fundamental Long Term Care Holdings, LLC (hereinafter "FLTCH") is the sole shareholder of Defendant THI-Baltimore and the sole member of FAS.   After FLTCH acquired THI-Baltimore in March 2006, employees of THI of Baltimore Management, LLC became employees of FAS or FCC, respectively, depending on their job duties.   On information and belief FLTCH is a non-New Mexico corporation doing business in New Mexico.   Defendant FLTCH owns and directly or indirectly controls all the other corporate defendants in this case.   FLTCH and the other corporate defendants are in reality a single integrated enterprise owned, controlled and operated by FLTCH.   As a single employer, Defendants THI at Hobbs, THI-NM, FAS, FCC, THI-Baltimore and FLTCH are responsible and liable for the illegal termination of Plaintiff's employment and other racially discriminatory conduct toward Plaintiff by the individual Defendants.   Defendant FLTCH has only two members: Murray Foreman and Leonard Grunstein.

**FACTS ABOUT DEFENDANTS' SINGLE INTEGRATED ENTERPRISE**

15.   Each THI-NM facility, including Plaintiff's immediate employer, Defendant THI-Hobbs, is wholly owned by THI-NM, which is wholly owned by THI-Baltimore, which is wholly owned by FLTCH, which is owned 50%  by Leonard Grunstein and 50% by Murray Foreman.   Defendant FAS is wholly owned by  FLTCH.   Defendant FCC is wholly owned by THI-Baltimore, which is wholly owned by FLTCH.   This corporate structure creates the illusion that Defendant Corporations are separate entities, deliberately obfuscating the authority and responsibility of the various corporate defendants in order to avoid discovery disclosures in litigation and hide culpability.

16.  Defendants FLTCH, FAS, FCC, THI-Baltimore, THI-NM, THI at Hobbs and the other health care facilities they operate in New Mexico constitute a single integrated enterprise.  Defendant Corporations exercise considerable control over facility operations at all THI-New Mexico centers and are in reality a single entity fragmented into separate LLC's in an elaborate attempt to avoid disclosure of information, liability and enforcement of judgments.  Defendant Corporations, acting as a single enterprise with the other Corporate Defendants are ultimately responsible for the illegal termination of Plaintiff's employment and other racially discriminatory conduct of FAS and FCC employees toward Plaintiff.

17.  On September 18, 2009, a jury in *Prendergast v. Fundamental Long Term Care Holdings, LLC., et al.,* determined that THI-NM, FAS, FCC, THI-Baltimore, FLTCH and the individual THI-NM facility involved in that case (Valle Norte, LLC) comprised an integrated enterprise.  See ***Prendergast v. Fundamental Long Term Care Holdings, LLC, et al.,*** Civil No. 07-1265 CG/LFG (D. NM), Special Verdict Form, Document 305, filed Sept. 18, 2009.  The fact that Defendant Corporations are a single enterprise was fully litigated by Defendants THI-NM, FAS, FCC, THI-Baltimore, and FLTCH in *Prendergast* and these Defendants here are collaterally estopped from challenging that determination a second time in this case.

18.  In addition to being the sole owners of Defendant FLTCH, Murray Foreman and Leonard Grunstein are the only directors of FLTCH and Foreman is FLTCH's only officer.  The address for FLTCH is 930 Ridgebrook, Sparks, Maryland.  The addresses for Defendants THI-Baltimore and FAS are also 930 Ridgebrook, Sparks, Maryland.

19.  Defendant FAS's and FCC's contracts are materially the same for every one of the approximately 100 THI facilities, including those in New Mexico.  FAS and FCC are

7

paid on the basis of these facilities' net operating revenues. FAS's management fee is 4% of net operating revenue and the FCC fee is 1%. FCC also has a contract for services with FAS.

20. All THI-NM facilities have the same operating handbook, the same policies, the same employee benefits and the same 401(k) plan. The facilities have the same internet provider and protocol for conducting back ground checks on employees. There is one FAS benefits coordinator who works with the HR/payroll employee at each facility regarding benefits. Changes to the handbook and benefits are announced by corporate, usually by Defendant Hood, and explained via teleconference calls with HR/payroll employees in different locations. All facilities have the same policies and procedures regarding administration and the way residents are treated.

21. As FAS Vice President for Human Resources, Defendant Hood is the primary contact for THI-NM facilities and FCC for human resource issues, such as handbook policies, employee complaints, employee discipline and benefits. Hood is a decision-maker on terminations at the facilities. Hood has the authority to discipline director-level employees. Hood visits facilities to audit items such as employee's files, payroll issues like vacation time, and timekeeping. Defendant Karen Hood directs facility level changes based on these audits.

22. As FCC Regional Director of Operations ("RDO"), Defendant Andujo was the supervisor for all THI-NM facility administrators in his region at all times material to this case. Andujo determined whether or not facility administrators should be hired or fired, determined their pay increases, oversaw their work performance, and set goals and objectives for them. Andujo informed one facility administrator that only the administrator or Andujo, himself, had the authority to terminate a director-level employee's employment.

8

23.   As FCC RDO, Defendant Andujo had weekly labor conversations with administrators regarding budget, staffing needs, and overtime. The calls would include the facility administrators and his/her managers if requested, Hood and a FAS recruiter.

24.   As RDO, Defendant Andujo was eligible for a bonus based on the financial performance, turnover rates and clinical outcomes of the accumulated performance of all the facilities he oversaw.  Andujo had regular meetings to review the financial goals, performance and operations of the facilities in his region.

25.  Calls to the employee hotline by THI-NM facilities' employees were received by the FAS compliance department. Employee complaints about a supervisor were investigated by Andujo, who reviewed his findings with Hood and sometimes the FCC Division President for his division. If there was a substantial complaint about a facility supervisor, Andujo would initiate discipline with Hood's assistance.

26.   As RDO, Defendant Andujo could pull employees from different THI-NM facilities to help at other locations if extra help was needed.  When facility employees move permanently from one THI-NM facility to another, it is considered an intra-company transfer and they do not lose their seniority.  When Andujo was promoted from facility administrator to FCC Regional Director of Operations, he understood that he worked for the same company and he maintained his seniority.

27.  FAS calculates the fees that are owed for the THI-NM facilities it serves. There is no consequence if the fee owed by a facility does not cover operating expenses.  FAS has never cancelled a contract or stopped providing services because a facility was in the negative.  The lack of payment by a facility to FAS is recorded as a "receivable" on FAS's books and a payable on the facility's books, and the balance just grows if the facility does not perform.  Although the contracts FAS has with the facilities do not require FAS to pay

anything to the facilities, at any given time some facilities have receivables owed by FAS.

28.  Revenues from all facilities go to a bank "lock box".  The funds in the lock box are applied to a line of credit for FAS.  FAS pays the vendors, rent, and all other operating expenses for the facilities. The payments are reflected as accounting entries for the facilities.

29.  All the profits earned by the facilities are reported on FLTCH's tax return and there are filings made at the shareholder level to reflect those results. The FAS tax department prepares the tax filings for THI-NM, THI-Baltimore and FLTCH.

30. There is one D&O insurance policy, held in the name of FLTCH, that covers all the facilities and named Defendants. The professional and general liability (PLGL) insurance policy that applies to the facilities is written in the name of FCC.  THI-Baltimore is also covered by PLGL policies held in the name of FCC.  A division level employee negotiates reimbursement rates for private insurance contracts that applied to numerous facilities.

31.  There is an electronic purchasing hub center for all facilities that they log on to purchase food and equipment. This service is provided to the facilities to maintain and operate on a daily basis.

32. Each region has a budget prepared by the FCC Divisional President, the RDOs and a FAS accountant.  Facility administrators list their needs for the next fiscal year and are given budgetary money calculated as so much per bed. The money is maintained by FAS until needed. Sometimes one facility's bills are past due because finances are prioritized to pay for repairs at other facilities.

33.  The paychecks for facility employees are issued by corporate a/k/a "Fundamental".   All facilities have the same Kronos system for payroll, and facility

employees received training on it from the Corporate Defendants.

34.   All facilities follow the same standardized process for approval of capital expenditures. A capital expenditure is for anything $500 or more with a lifetime of 12 months or longer.  Facility administrators could not make any capital expenditures without going through Defendant Andujo and RDOs like Andujo cannot make any major expenditures for facilities without going through Corporate Defendants' Division Presidents. Andujo would forward expenditures to the Defendant FCC Divisional President for approval and the money would then be released by Lynn Weir at Defendant FAS.

35.   Marketing for all facilities was handled by Corporate Defendants' division-level employees who reported to the Division President and a regional marketing employee and a business development individual who reported to Defendant Andujo.

36.   Defendant FAS provides a centralized website and recruiting and marketing services for all facilities.  The website is simply labeled "Fundamental" because different entities recruit for jobs using this web page.  Defendants FAS and FCC use this website to look for applicants. Facility level positions are also posted on this website.

37.   Although Defendant Andujo oversaw at least 12 THI-NM facilities covered by Defendant FAS and Defendant FCC contracts, advised them how to be profitable, and oversaw their budgets, he admitted in a deposition that he did not know how the "management fee" was set, who set it, how it was calculated, how it was paid by the facilities or whether it could be reduced.  Andujo received no training regarding Defendants' corporate structure.

38.   As RDO, Defendant Andujo was informed of employment discrimination or harassment claims at a facility and he was involved with settling such claims, but did not know where the settlement money came from.

11

39.  As RDO, Defendant Andujo supervised some marketing employees, but did not know whether they worked for Defendants FCC or FAS.  He admitted that it did not matter who actually employed these marketing employees concerning matters related to their supervision or employment.

40.  Defendant Corporations exercise considerable control over facility operations at all THI-New Mexico centers and are in reality a single entity fragmented into separate LLC's in an elaborate attempt to avoid disclosure of information and liability.

### FACTS CONCERNING THE DISCRIMINATORY DISCIPLINE AND DISCHARGE OF PLAINTIFF

41.  Prior to her employment with Defendants, Plaintiff Sarah Walker had earned an Associate's Degree in business administration, a Bachelor's Degree in General Business with a minor in Computer Science, and a Master's Degree in Education.

42.  Prior to her employment with Defendants, Plaintiff had been employed for five years by the federal Women Infants and Children program to interview applicants for benefits and issue benefit checks, and then for five years as an unemployment tax auditor for the New Mexico Department of Labor.

43.  In August 2005 Plaintiff accepted a job with Defendants as the Business Office Manager ("BOM") of Corporate Defendants' Hobbs Health Care Center in Hobbs, New Mexico.  Plaintiff was the only African-American employed in a top-level management position at any of the facilities operated by Defendant THI within the district supervised by Defendant Andujo.

44.  Defendant THI of New Mexico at Hobbs Center, LLC d/b/a Hobbs Health Care Center is an 118 bed nursing home.

45.  Before Plaintiff accepted the job of BOM, she was promised by Defendants that

she would receive extensive training in how to perform all aspects of the BOM at the Hobbs Center.

46.   After Plaintiff was hired, Defendants failed to provide her with the promised training.  In addition, the person who was supposed to provide this training to Plaintiff, Defendants' Regional Accounts Director Debbie Lothridge repeatedly made racially discriminatory, demeaning and disparaging comments about Plaintiff, both to her face and to other employees.

47.   During the Fall 2005, Defendants' Regional Accounts Director Defendant Debbie Lothridge walked into the Hobbs Health Care Center office and looked at the three employees who worked in that office: Business Office Manager Sarah Walker, Payroll Clerk April Williams and Receptionist Sherita Broach, all of whom are African-American women.   Defendant Lothridge said out loud: "All black, this won't do."   In addition, Defendant Lothridge told another of Defendants' managers: "I don't know why you have three black people in the front office."   She also begged this departing manager who was white to stay so there would be fewer black employees in the office.

48.   Plaintiff repeatedly complained to her supervisors and Defendants' human resources personnel about Defendant Lothridge's abusive and discriminatory conduct. Defendants failed to interview Plaintiff, either did not investigate Plaintiff's complaints at all or did not properly investigate those complaints, and did not take any disciplinary action against Defendant Lothridge.

49.   During the Fall 2005, Defendants' Regional Director of Operations, Defendant Jaime Andujo, described to Plaintiff her job responsibility to collect on billings and her relationship to him as follows: "I am your pimp and you are my whore.  Your job is to go out and get me my money."   Defendant Andujo spoke to her in this manner, in whole or in

part, because she is black.  To Plaintiff's knowledge Defendant Andujo never said anything at all like this to any of Corporate Defendants' white employees.

50.   Despite the fact that Defendants failed to provide Plaintiff with the promised training, she performed her job well during her tenure as BOM.  Plaintiff received repeated monthly monetary bonuses in her paycheck for meeting or exceeding defendants' goals for her.  In addition, Plaintiff was a hard-working and dedicated employee who regularly worked through lunch, took no breaks and frequently worked until midnight.  In August 2006, Plaintiff received an excellent annual performance evaluation for her work as BOM at the Hobbs Health Care Center, and prior to the campaign to terminate her Plaintiff had never received any discipline, write-ups or reprimands.

51.   Nonetheless, in the Fall 2006, Corporate Defendants' Regional Accounts Manager, Defendant Diana Melton, who had become one of Plaintiff's supervisors, began to treat Plaintiff in a demeaning, rude and racially discriminatory way.  Defendant Melton loudly criticized Plaintiff and talked about her in earshot of other employees.  She failed to provide Plaintiff requested feedback on her or to answer Plaintiff's questions.  She asked Plaintiff to backdate Medicaid documents, but because this was illegal and improper Plaintiff refused to do this.  Plaintiff complained to her supervisors and Defendants' human resources personnel about Defendant Melton's abusive and discriminatory conduct. Defendants failed to interview Plaintiff, either did not investigate Plaintiff's complaints at all or did not properly investigate those complaints, and did not take any disciplinary action against Defendant Melton.

52.   Defendants also refused to allow Plaintiff to take vacation days during the beginning of a month, ostensibly because Medicaid billings had to be done on the first of each month.  But Defendants allowed other non-African-American BOMs in their other

nursing homes around New Mexico to take vacation time at the beginning of a month and Defendants simply provided assistance to those offices to get the work done in these BOMs' absence.

53.   During November 2007, Defendant Melton approached Plaintiff's immediate supervisor, Hobbs Center's Director, Billy Cummings, and told him that she wanted Sarah Walker put on an "Action Plan."   According to Corporate Defendants' employee policies, an Action Plan is a form of discipline that is supposed to be imposed only after other less drastic forms of discipline – such as verbal and written reprimands – have been tried and failed.   Prior to the imposition of the Action Plan, Plaintiff had never had any discipline of any kind imposed by Defendants.   Indeed, rather than prior verbal or written reprimands, Plaintiff had received numerous monthly bonuses for her work.

54.   Billy Cummings informed Defendant Melton that he thought Sarah Walker was doing satisfactory work and should not be placed on an Action Plan.   He told Defendant Melton that Sarah Walker's work was at least as good as the work of her predecessor in the BOM job, Jan Fagen, who had not been placed on an Action Plan.   Jan Fagen was a white woman.   In fact, on November 20, 2006 Billy Cummings wrote in an e-mail to his regional supervisor, Defendant Jaime Andujo: "Sarah tells me she has billed all the Medicaid she has to bill right now; she isn't aware of billing that remains to be done.   I'm going to tell you right now that I cannot understand how this big rift has developed between Diana [Melton] and Sarah [Plaintiff].   I can assure you that Diana never came to me with any issues with Sarah.   Sarah is not perfect and if she needs improvement, that is fine. We will work on that.   But all I have ever heard was praise."

55.   Despite Plaintiff's satisfactory work record and bonuses and the objections of Plaintiff's supervisor Billy Cummings, Defendant Melton, acting in concert with Defendants

Jaime Andujo and Karen Hood, instructed Billy Cummings to put Sarah Walker on an Action Plan and, in order to insure that would occur, told Mr. Cummings that he would be fired if he did not sign off on this.

56. Consequently, on December 1, 2006, Plaintiff was put on an "Action Plan." This Action Plan was actually a bogus Action Plan; it was a set-up both to make it look like Plaintiff had been disciplined and to ensure that Plaintiff would fail. Most of the items in the Action Plan – timely billing of Medicaid, billing of hospices and certain record keeping procedures – were already being done by Plaintiff as part of her job as BOM. But the Action Plan also demanded that Plaintiff not only meet her goals as required by corporate headquarters, but exceed them by $200,000 by the end of that month and into an unlimited future. This was completely impossible for Plaintiff or any other BOM to accomplish. Defendants knew that no other business office manager had been able to exceed monthly goals by $200,000. Defendant Diana Melton and the other defendants included this requirement in Plaintiff's Action Plan to ensure that Plaintiff would fail. In fact, Defendant Melton told Plaintiff that she knew Plaintiff could not comply with the Plan and that Plaintiff would soon be "gone."

57. The only other Action Plan imposed by Defendants in the relevant time frame was one imposed a year earlier against the BOM in THI's Las Cruces nursing home. In stark contrast to the Action Plan imposed on Plaintiff, Defendants imposed a reasonable and fully attainable Action Plan requiring the Las Cruces BOM, who was **not** African-American, to exceed her goals by only 5 percent or $50,000, each month for a limited time.

58. Even though the Christmas holidays caused an interruption in the normal work of the Center, Plaintiff substantially achieved everything in the Action Plan in December 2006. She even exceeded her corporate goal for collections by 8% (i.e., she collected

108% of what headquarters had set as her goal for the month), which amounted to $33,418 more than the goal.

59.  On Friday December 29, 2006 in the course and scope of her work, Plaintiff was in an automobile accident that caused her to suffer a substantial injury.  She rested at home over the weekend and then, in order to comply with her Action Plan, Plaintiff came to work on Monday January 1, 2007 to get out her Medicaid billings on the first of the month, even though it was a holiday, the other administrators had the day off and she was in considerable pain from the auto accident.  On or about January 3, 2007 Plaintiff was able to get a doctor's appointment.  Her doctor ordered her to miss work for about a week to recover from the accident.  Plaintiff provided Billy Cummings with a copy of the doctor's letter and called him each day to keep him apprised of her status.  Mr. Cummings approved of her taking sick leave to recover from the accident and knew that she was out of work for that reason.

60.  On or about January 10, 2007, Defendants Diana Melton, acting in concert with Defendants Jaime Andujo and Karen Hood (Miller) prepared a letter for Billy Cummings's signature terminating Plaintiff's employment with Corporate Defendants.  This letter, with Mr. Cummings's name already typed in, was presented to him to sign on January 10, 2007.  Mr. Cummings informed Defendants Melton, Andujo, and Hood that he had "professional and personal objections" to terminating Sarah Walker and that, if he was forced by them to participate in the wrongful termination of Ms. Walker, he would resign.  Mr. Cummings explained to Defendants Melton and/or Andujo and/or Hood that Plaintiff's work was comparable to the work done by her predecessor at the Hobbs Center and by the BOMs in other nursing homes run by Corporate Defendants.  Mr. Cummings told these individual Defendants that Ms. Walker did not deserve to be terminated and that he would be happy

17

to continue to work with her.

61.   Despite Mr. Cummings' strong objections, Defendants Melton and/or Andujo and/or Hood overruled him and required Mr. Cummings to sign the letter terminating Plaintiff's employment.   Mr. Cummings signed the letter under what he describes as "duress" and he resigned from his employment with Corporate Defendants shortly thereafter.

62.   The letter terminating Plaintiff is dated January 10, 2007 and states that effective January 8, 2007 she had been fired "for continuing unsatisfactory performance." The reason stated in this letter was false and pretextual.   The letter also falsely states: "Sarah, we have been trying to reach you via phone to schedule a meeting with you to discuss your employment.   Since we have not been able to contact or meet with you personally ...."   Mr. Cummings and others at the Hobbs Center knew that Plaintiff was at home recovering from her auto accident and had Defendants actually been trying to reach Plaintiff, they could easily have reached her at her home.

63.   In all her years of employment, Plaintiff had never been terminated before. Indeed, she had never been subjected to any kind of discipline or even a negative evaluation before.

64.   Defendants immediately replaced Plaintiff with Debbie Moore, a white woman who merely had a high school diploma.   Ms. Moore was given the title of Senior Business Office Manager and was given a salaried, rather than an hourly, pay scale.   Plaintiff's title had been simply Business Office Manager and she was an hourly employee.   According to Mr. Cummings and others at the Hobbs Center, Debbie Moore has not performed the job of collecting accounts payable any better than Plaintiff had done.   In addition, unlike Plaintiff, Ms. Moore has been the subject of numerous complaints that she does not return

patients' families' telephone calls and has failed to file supplemental insurance claims. Upon information and belief, Plaintiff alleges that Ms. Moore has not been disciplined for this conduct.  Further, Ms. Moore has been allowed to repeatedly take long lunch hours and breaks without incurring any discipline.  Instead, on the occasions when Ms. Moore has met her collections quota, Defendant Melton has sent her flowers in congratulation, treatment never afforded to Plaintiff by Ms. Melton when Plaintiff met her quotas. Moreover, despite the fact that Ms. Moore was significantly deficient in meeting her collection quotas for a substantial period of time, to the best of Plaintiff's knowledge, no disciplinary action was taken against her.

65. Plaintiff timely filed a charge of race discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC").

66. In its July 17, 2007 letter responding to Plaintiff's charge of racial discrimination, Defendants, acting in concert, falsely informed the EEOC that:

a.  Billy Cummings had hired Plaintiff;

b.  During Plaintiff's employment as BOM, Billy Cummings was dissatisfied with her job performance;

c.  Plaintiff had failed to meet the requirements of her job after being given an opportunity following being given the Action Plan; and

d.  The decision to terminate Plaintiff was made by Billy Cummings.

67. In fact, these false statements were a pretext provided by Defendants to hide the fact that their termination of Plaintiff's employment was motivated in whole or in part by Defendants' racial animus against Plaintiff.   As explained above in this Second Amended Complaint:

a.  Plaintiff was hired in August 2005, before Billy Cummings was hired as the Director of the Hobbs Health Care Center on October 10, 2005;

b.  Billy Cummings, who was Plaintiff's most immediate supervisor and the person most familiar with her work, was "pleased" with Plaintiff's job performance.

c.  Plaintiff had performed satisfactory work, comparable to others in her position who were white.   In addition, Defendants fired her even though she had substantially implemented the Action Plan given to her on December 1, 2006.

d.  Billy Cummings did not decide to terminate Plaintiff's employment, in fact, he strenuously resisted Defendants' decision to terminate Plaintiff and ultimately resigned over their decision.  Mr. Cummings informed Defendants that he had heard "nothing but positive comments and praise for her work previously."

68.   When Billy Cummings was made aware of Defendants' false response to Plaintiff's EEOC charge, he voluntarily provided an affidavit to the EEOC rebutting Defendants' false claims.

69.   When Defendants became aware of Mr. Cummings's affidavit, they attempted to impeach him two different times by falsely informing the EEOC that Mr. Cummings did not want to issue the discipline because "he had a personal relationship with Charging Party [Plaintiff] through family" (Defendants' April 3, 2008 letter to EEOC) and because "of his personal friendship with her" (Defendants' April 29, 2008 letter to EEOC).  They also included affidavits by Defendants Diana Melton and Karen Hood (Miller), who, using identical language, falsely claim that Mr. Cummings had told them he "found Ms. Walker's job performance to be unacceptable," "agreed that Sarah Walker should be placed on an action plan related to her poor job performance," "agreed that Sarah Walker should be terminated," and "did not want to issue the disciplinary actions to Sarah Walker because he had a personal relationship with her through family."  Billy Cummings does not have a personal relationship with Plaintiff or her family and has never associated with her outside of work.  Mr. Cummings's only connection to Plaintiff's family is that his son works for the Hobbs Police Department, as does Sarah Walker's husband.  Mr. Cummings in his affidavit to the EEOC has contradicted all of Defendants' employees' other false statements.

70.  Corporate Defendants' own records demonstrate that Plaintiff repeatedly met or exceeded Corporate Defendants' goals.

71.  Corporate Defendants' salary documents reveal that during the time they claim that Plaintiff's performance was inadequate, they paid her the following bonuses and salary raises for her excellent performance as BOM:

| June 16, 2006 | $2,200.00 bonus |
| August 25, 2006 | $0.48 per hour permanent pay raise |
| October 6, 2006 | $150.00 bonus |
| October 20, 2006 | $0.25 per hour permanent pay raise |
| November 17, 2006 | $250.00 bonus |

72.  Corporate Defendants paid Plaintiff a lower wage than her predecessor, Jan Fagen, who was not African-American, was paid and a lower wage than her successor, Debbie Moore, who was not African-American.

73.  Defendants failed to follow their own progressive discipline employment policy when they terminated Plaintiff.  This policy provides that before employees are terminated for unsatisfactory work performance they should receive progressive warnings and clear descriptions of work requirements and expectations in the form of a verbal reprimand, followed by a written reprimand if the problem is not corrected, followed by a corrective action plan, followed by suspension or termination if the reasonable requirements of the action plan are not met within a reasonable amount of time.  All of these progressive steps are required to be documented in an employee's personnel file.  This progressive discipline employment policy is reflected in Corporate Defendants' Employee Handbook and in training that Plaintiff, who is herself a supervisor, received from Corporate Defendants'

human resources employee.

74.   Instead of following their own progressive discipline procedures and in spite of the fact that Plaintiff had repeatedly received monetary bonuses and/or salary raises for her job excellent performance, Defendants issued to Plaintiff an unreasonable corrective Action Plan designed to make her fail, without any prior verbal or written reprimands of any kind, let alone ones that specified the aspects of her job performance that she needed to improve.  In addition, as described more fully above in this Second Amended Complaint, Defendants then fired Plaintiff from her job 40 days after she received the Action Plan, despite the fact that she had substantially achieved the requirements of that Plan and her immediate supervisor had evaluated her work as satisfactory.   Thus, Defendants terminated Plaintiff's employment in flagrant violation of their own employee policies, procedures and practices which clearly applied to Plaintiff.

75.   According to Corporate Defendants' personnel records for the period August 1, 2005 through August 9, 2007, in all 14 of Defendants' health care centers in New Mexico, Plaintiff was the **only** black person employed in the position of Business Office Manager.  Plaintiff is the only black person to serve as BOM at the Hobbs Health Center and she is the only black to person to serve as BOM in any of Corporate Defendants' nursing homes in New Mexico.

76.   At least since 1995 Corporate Defendants have not had an African-American serve as Regional Director of Operations in New Mexico, nor as Regional Accounts Manager nor as Health Center Director at any of its 14 nursing homes located in New Mexico.

77.   Defendants have engaged in a pattern and practice of discriminatory conduct toward African-Americans.  In addition to not employing African-Americans in high level

managerial positions in New Mexico, there have been at least four charges of racial discrimination made against Defendants by African-American employees at the Hobbs Health Care Center within the last two years.

78.  Subsequent to Plaintiff's filing a charge of race discrimination with the EEOC, Defendants conspired to fabricate a defense by falsely making it appear that Plaintiff was disciplined and discharged by her immediate supervisor, Mr. Cummings, as per Defendants' policy and practice.   Despite Defendants' improper effort, the EEOC determined that: "The evidence obtained substantiated Charging Party's [Plaintiff's] allegations.   The evidence revealed that Charging Party's race was a factor in her discharge.   Therefore, I have determined that the evidence obtained during the investigation indicates that there is reasonable cause to believe that Charging Party was discriminated against because of her race, Black, in violation of Title VII of the Civil Rights Act of 1964, as amended."

## CLAIMS FOR RELIEF AND DAMAGES

79.  THI-Hobbs and all the other Corporate Defendants acting as a single, integrated enterprise subjected Plaintiff to race discrimination and/or to retaliation for having complained internally about racial discrimination.  The conduct of Corporate Defendants described in this Second Amended Complaint, including but not limited to their termination of Plaintiff's employment, violated rights secured to Plaintiff by Title VII, 42 U.S.C. §2000e-2 and -3.

80.  All individual and all Corporate Defendants acting as a single, integrated enterprise subjected Plaintiff to race discrimination and/or to retaliation for having complained internally about racial discrimination.  The conduct of all Defendants described

in this Second Amended Complaint, including but not limited to their termination of Plaintiff's employment, violated rights secured to Plaintiff by the New Mexico Human Rights Act.

81.   The conduct of all individual and Corporate Defendants described in this Second Amended Complaint, including but not limited to their termination of Plaintiff's employment, violated rights secured to Plaintiff by 42 U.S.C. §1981 and constituted an intentional infliction of emotional distress.  The Corporate Defendants are liable under the doctrine of respondeat superior, *inter alia*, because Defendants Melton, Andujo, Lothridge and Hood (Miller) were acting in the course and scope of their employment while under the color of the authority given to them by Defendants THI-NM, FCC, FAS, THI-Baltimore, and/or FLTCH and because they were aided in their actions by their positions as Regional Director of Operations (Andujo), Regional Accounts Manager (Melton and Lothridge) and Vice President of Human Resources (Hood-Miller).  Defendants THI-NM, FCC, FAS, THI-Baltimore, and/or FLTCH are also liable because one or more of these Corporate Defendants ratified these Defendants' conduct.   In addition, as a single integrated enterprise and employer Defendants THI-NM, FCC, FAS, THI-Baltimore, and FLTCH are liable for the discriminatory and tortious conduct of FAS and FCC employees.

82.  The conduct of all Defendants in terminating Plaintiff on January 10, 2007 also constituted an unlawful breach of Plaintiff's employment contract.

83.   As a direct and proximate result of the conduct of all Defendants, Plaintiff suffered and continues to suffer loss of income, severe emotional distress, anxiety, humiliation, embarrassment, medical bills and the violation of her federal and state statutory rights.

84.  At all times material hereto, each of the Defendants acted intentionally, willfully,

with deliberate indifference, with reckless indifference and/or with malice toward the federal and state statutory and common law rights of Plaintiff. For this reason, Plaintiff is entitled to an award of punitive damages against each Defendant.

WHEREFORE, Plaintiff prays for the following relief:

1. For an award of back pay and reinstatement into her position as Business Office Manager for Defendant Hobbs Health Care Center, with all appropriate increases in salary to which she would have been entitled if she had not been unlawfully terminated, or adequate front pay if this reinstatement is not appropriate;

2. For compensatory damages in an amount to be determined by the trier of fact;

3. For punitive damages against each Defendant;

4. For pre and post judgment interest;

5. For reasonable attorneys fees and costs pursuant to 42 U.S.C. §2000e, 42 U.S.C. §1988 and the New Mexico Human Rights Act; and

6. For such other and further relief as the court deems just and proper.

Respectfully Submitted,

 /s/   DANIEL YOHALEM
Daniel Yohalem
1121 Paseo de Peralta
Santa Fe, New Mexico   87501
(505) 983-9433      Fax: (505) 989-4844

Richard Rosenstock
1121 Paseo de Peralta
Santa Fe, New Mexico   87501
(505) 988-5324      Fax: (505) 989-4844

Katherine Murray
1121 Paseo de Peralta
Santa Fe, NM 87501
(505) 983-9433      FAX  (505) 989-4844

Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on the __15th__ day of November, 2010, I served the foregoing Second Amended Complaint by e-mailing a copy thereof and this Certificate of Service to Defendants' attorneys: Trent A. Howell and Danny W. Jarrett, Jackson Lewis LLP, 4300 San Mateo Blvd. NE, Ste. B260, Albuquerque, NM 87110; John A. Bannerman and Margaret A. Graham, 2201 San Pedro NE, Building 2, Suite 207, Albuquerque, New Mexico 87110; and Barbara G. Stephenson and Quentin F. Smith, P. O. Box 271, Albuquerque, NM 87103.

I filed this Certificate of Service electronically through the CM/ECF system, which caused the following counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

jarrettd@jacksonlewis.com
trent.howell@jacksonlewis.com
jab@nmcounsel.com
pmg@nmcounsel.com
bgs@sheehansheehan.com
qfs@sheehansheehan.com

_/S/ DANIEL YOHALEM___
Daniel Yohalem